IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

EMILY K. HELM,          }
                          }
     Plaintiff,      }
                          }     CIVIL ACTION NO.
v.                     }     05-AR-2079-S
                          }
LEEDS WATER WORKS BOARD,   }
                          }
     Defendant.      }

## MEMORANDUM OPINION

The motion of defendant, Leeds Water Works Board (the "Board"), for summary judgment in the above-entitled action brought by plaintiff, Emily K. Helm ("Helm"), has been briefed and is under submission.  Helm claims under the Age Discrimination in Employment Act of 1967 ("ADEA"), under Title VII of the Civil Rights Act of 1964 ("Title VII"), and under  42 U.S.C. §1983 ("1983").  For the reasons that follow, this court will grant the Board's motion.

## I. Facts[1]

Helm is a forty-seven year old female.  She began working for the Board as a customer service representative ("CSR") in January 2001.  In the summer of 2002, her duties were modified, and she was moved to an accounts payable position.  Only a few months later she submitted a letter to the Board complaining that she had improperly

---

[1] Some of the facts pertaining to the Board's motion are in dispute.  For purposes of this opinion, the court will consider these facts in the light most favorable to Helm, the non-moving party.

been denied a promotion to the position of inventory control clerk/purchasing agent ("ICC/PA"). Her long letter could be construed as a complaint of gender discrimination and/or of age discrimination. In October 2003, after a hearing by the Board, Helm's grievance was denied. She made no claim to the EEOC based on the denial of her grievance. In December 2003, she was transferred back to her old position as a CSR and given a raise.

### I. The Bank Bag

As a CSR, Helm's primary duty was to receive money from water customers. Each CSR carried a bank bag in which he or she kept cash receipts and orders from customers. Typically, after a CSR takes collections, the bank bag is turned in to Regina Briskey ("Briskey"), the CSR supervisor, who is responsible for balancing what is in the bank bag and making deposits. It was common practice for the Board to cash its employees' personal checks. Carla Ford ("Ford"), the administration manager, testified that the usual practice was for these checks to be cashed by the company cashier. However, according to Helm, the company cashier was confused by the process, and as a result, Helm began using the cash in her bank bag to cash her own personal checks. The extent to which other employees engaged in this peculiar practice is in dispute. Ford and Bill Morris ("Morris"), the Board's CEO, have testified that they were unaware of the practice, and it was not sanctioned by any written Board policy.

On September 29, 2004, Helm serviced a customer, who paid her $75.00 in cash. Two days later, Helm says she "cashed" her own personal check for $70.00 from her bag, but did not put her personal check payable to the Board for that amount in the bag to make the receipts balance. On that same afternoon, Helm was informed by Morris that she was being suspended for three days as punishment for an unrelated problem discussed below. Helm claims that she became so emotional when suspended that she forgot to put her check in the bag. The next morning, realizing her error, Helm contacted a co-worker, Patricia Vandergrift ("Vandergrift"), and asked her to place a $70.00 check in the bag. Exactly how Vandergrift was going to produce such a check written on Helm's bank account is unexplained. Allegedly because of a family emergency, Vandergrift never put a check in Helm's bag. This was Helm's only effort to replace the cash she took from the bag. On October 11, 2004, Helm returned to work and began collecting payments as usual. After work, she turned in her bag, still short the $70.00. The next morning, Morris confronted her about the missing money. Shortly thereafter, she was terminated. Helm has not offered any evidence that any superior other than Morris was the decisionmaker, and the Board apparently concedes that Morris was the sole decisionmaker and had the authority to discipline Helm, including the right to fire her.

3

### ii. Other Disciplinary Issues

Before her termination, Helm was twice disciplined for attendance problems.  On September 15, 2004, Board employees met to discuss plans for dealing with Hurricane Ivan, which struck the Birmingham area the next day.  At the meeting, Morris instructed all employees to call in if they found themselves unable to make it to work.  That night, Helm lost her power and phone service, and she was unable to call in when she missed work.  She was docked two days pay for her absence.   After receiving this discipline she made no claim to the EEOC.  A little over a week later, she left work early to get her driver's license renewed.  She claims that she asked for and received permission to leave work early on that occasion.  The Board insists that she did not ask for and was not granted permission to leave early.  It is not disputed that when she returned to work the next day, Morris suspended her for three days.  She made no claim to the EEOC for the suspension, but being informed of the suspension that she says caused her to forget to return $70.00 to her bank bag.

### iii. Helm's Expressive Conduct

Helm engaged in two separate instances of allegedly protected expression which, she alleges, motivated her termination and possibly other adverse employment actions.  The first occurred on September 16, 2003, when she delivered the previously mentioned

letter to her employer making various, if enigmatic, allegations of gender and age discrimination.  The letter detailed her employment history with the Board and characterized the work environment as being dominated by a "'good ole boy' mentality."  Pl.'s Ex. 8 at 3. Her missive also addressed the Board's alleged dysfunctional purchasing practices and accused the Board's management of allowing potentially illegal conduct to continue unabated.  Her main complaint in her letter was that the Board had improperly failed to promote her to the ICC/PA position.  She never expressly charged that the decision not to promote her was on account of her age. She did not favor the media with a copy of her letter, and it drew no public comment.

The second instance allegedly occurred less than a month before Helm was terminated.  In September 2004, she received a subpoena requiring her testimony in criminal proceedings against Lee Barnes, Sr. ("Barnes"), who was the former chairman and a current member of the Board's board of directors.  Barnes was originally charged with three criminal counts of fraud and was eventually acquitted on the sole count that went to trial.  As is discussed below in Section III.iv, there is no evidence that Helm actually testified in the Barnes case until well after her termination.  Also, there is no evidence that Barnes was a "decisionmaker" who terminated Helm.

5

## II. Summary Judgment Standard

In considering a Rule 56 motion, the court must construe the evidence and make factual inferences in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). The court can enter summary judgment only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242-43 (1986) (citations omitted).

### III. Analysis

### i. Title VII Gender Discrimination[2]:

Title VII makes it unlawful for an employer to discharge a female, or otherwise discriminate against her with respect to her compensation, terms, conditions, or privileges of employment, because of her gender. *See* 42 U.S.C. §2000e-2(a)(1).

In order to recover for gender discrimination, Helm must first establish a *prima facie* case, which can be established using either

---

[2] The parties understandably expend little effort in briefing Helm's claims of gender discrimination. Even so, this court must make a foray into this claim.

direct or circumstantial evidence of discriminatory animus.   In cases such as this one, where plaintiff offers only circumstantial evidence of discrimination, the sufficiency of her Title VII claim is evaluated under the familiar three-part framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089 (1981).  *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*).  To satisfy her *prima facie* burden, a plaintiff must show: (1) she is a member of a protected class; (2) she was subject to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job.  *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citations omitted).  If the plaintiff successfully establishes a *prima facie* case, the defendant-employer must articulate a legitimate, nondiscriminatory reason for the challenged employment practice.  Finally, if the employer articulates one or more nondiscriminatory reasons, the plaintiff must present sufficient evidence to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.  *See Thomas v. Aventis Pharmaceuticals*, 177 Fed. Appx. 54 (11th Cir. 2006).

In the third step of the *McDonnell Douglas* framework, the pretext analysis, the plaintiff may succeed by "either directly

persuading the court that a discriminatory reason more likely motived the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). In other words, the plaintiff must present sufficient evidence to create a genuine issue of material fact that each of the defendant-employer's articulated reasons is pretextual, or else the employer is entitled to summary judgement. *Chapman*, 229 F.3d at 1024-25.

a) The *Prima* Facie *Case*

The Board does not dispute that Helm is a member of a protected class, was subject to an adverse employment action, and was qualified for the position she held. Therefore, to establish a *prima facie* case of gender discrimination Helm need only point to a similarly situated male colleague who engaged in similar acts of misconduct but who received more favorable treatment. The undisputed facts indicate that Helm was disciplined and eventually terminated after three instances of misconduct that occurred in a one month period. First, she was suspended for not calling in to work before Hurricane Ivan. Second, she was disciplined for leaving work early without permission. Finally, she was terminated after the check-cashing incident.

Helm identifies two individuals as to whom, she argues, she is similarly situated and to be fairly compared. The first, Wayne

8

Byers ("Byers"), is the former superintendent of the Board.   The second, Dennis Abernathy ("Abernathy"), is the assistant superintendent.   "To show that employees are similarly situated, [] plaintiff must show that the employees are similarly situated in all relevant respects. . . ."  *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003).   When analyzing purported comparators, "[t]he most important facts . . . are the nature of the offenses committed and the nature of the punishment imposed."  *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001).   "The quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions . . . ."  *Maniccia*, 171 F.3d at 1368.   The Board argues that neither of the purported comparators is similarly situated to Helm because (1) both performed duties that were managerial and that frequently took them outside the office, and (2) the nature of their misconduct was dissimilar to that of Helm.

Byres began working for the Board in 1974, eventually becoming superintendent.   In this role, he supervised all field work and much of the Board's purchasing activity.   Byers's long tenure was marred by two instances of sexual harassment and/or verbal misconduct.   The first occurred when he violently threatened a female co-worker.   For this, he was given a ninety day suspension.

In another incident, Byers was accused by a female co-worker of sexual harassment.  Instead of disciplining Byers, the Board permitted him to retire and then entered into a contract retaining him as a paid, independent contractor, an arrangement often reached by the Board with retiring executives.

Abernathy is now the assistant superintendent of the Board. After becoming assistant superintendent, his duties often required him to work after hours and to be on call after the close of business.  Additionally, Abernathy would fill in for Byers when Byers was out sick or on vacation.  Abernathy was congenitally tardy, being late to work a total of some sixty times over the course of a single year.  Helm offers into evidence seven written warnings that were placed in Abernathy's file.  In addition, Abernathy was twice suspended for three days without pay, first in January 2003 and then in January 2005.  Pl.'s Ex. 2.[3]  In other words, Abernathy received plenty of discipline short of termination.

Helm and Byers are not similarly situated for purposes of Title VII.  Byers was a senior member of the Board's management who had spent nearly thirty years as a Board employee.  More

---

[3] In her brief, Helm incorrectly implies that Abernathy was suspended for the first time only after Helm had herself been terminated.  *See* Pl.'s Br. at 7-8.

importantly, the conduct for which he was disciplined cannot fairly be described as "nearly identical" under the standard adopted by the *Maniccia* court.   The conduct for which Helm was terminated involved the mishandling and misappropriation of cash.   Her attempt to categorize this conduct as general "misconduct" comparable to Byers's misconduct, though artful, is unsuccessful.[4]   Helm is correct that both she and Byers were guilty of misconduct, but it was hardly of a similar type.   Therefore, Helm cannot establish a *prima facie* case for her termination based on Byers as a comparator.

In attempting to compare herself with Abernathy, Helm is marginally more successful.   Abernathy was, in fact, disciplined for his repeated tardiness.   In this regard, the treatment was not disparate.   Helm was disciplined for failing to call in when the hurricane hit and for taking an afternoon off.   Abernathy was not disciplined for his failure to call in when the hurricane hit but he was on vacation, a stark difference.   For Helm to establish a male comparator, she must present "nearly identical" conduct, not "nearly identical and contemporaneous" conduct.   Both Helm and

---

[4] The Board has moved to strike the evidence cited by Helm in support of her position as inadmissible hearsay.   As discussed elsewhere in this opinion, the court need not rule on this motion in order to proceed with this opinion.   *See infra* Section III.iii.b.

Abernathy committed attendance-related misconduct.  The two are therefore similarly situated in that respect.  The Board argues that the two cannot be similarly situated because Abernathy is a more senior employee whose duties are more extensive than Helm's. Because the court must draw all reasonable inferences in favor of the non-moving party the court will not grant the Board summary judgment on the sole basis of a dissimilarity in job responsibilities, as argued by the Board.  Although Helm has successfully established a *prima facie* case under Title VII for her claim to the extent it is based on the similarity of her conduct to that of Abernathy as relates to attendance, her primary complaint is about her discharge.  She would never have filed suit over a three day suspension or a warning.  The Board only employs Helm's absences as **one** of its reasons for terminating her, and it is not the first articulated or precipitating reason.  The discipline meted out to Abernathy was not less onerous than that administered to Helm for absenteeism, that is unless Helm's discharge was based on her absences and not on her removal of $70.00 from her bank bag. While Abernathy was not discharged for his absences, and thus a recipient of lesser discipline than Helm, he did not "borrow" money from the Board without permission and forget to pay it back.  At this point, any similarity between Helm and Abernathy breaks down. This leaves Helm without a legitimate comparator, and destroys her

gender claim.

   *b) The Board's Proffered Justifications*

   Assuming, *arguendo*, that Helm has shown a comparator in
Abernathy and that the burden thereupon shifts to the Board to
proffer legitimate, non-discriminatory justifications for its
conduct, the Board asserts that its actions were justified because
(1) Helm violated the specific policy adopted by the Board for
dealing with Hurricane Ivan, and (2) that she left work early
without permission from her supervisor. If true, these reasons are
legitimate reasons for the Board's action, unrelated to gender and
would destroy anything left in a gender claim.

   *c) Pretext Analysis*

   Once a defendant-employer has articulated a legitimate
justification for its action, the burden shifts back to plaintiff
to establish that the proffered reasons are pretextual.[5] The best
evidence of pretext Helm can muster is a close relationship between
Abernathy and Barnes.  It is undisputed that Abernathy was commonly
referred to by Board employees as "Barnes's Boy."  This sobriquet
arguably indicates that Barnes had a special fondness for
Abernathy.  Barnes testified in his deposition that he had been

_____

   [5] In the context of her related Title VII-retaliation claims,
Helm identifies evidence of pretext in the Board's actions.  This
evidence is equally applicable to the gender discrimination
claims discussed in this section.

friendly with Abernathy since the latter was a child.  Barnes was a member of the Board at the time it promoted Abernathy to the assistant superintendent position.  However, this evidence does not furnish any basis for a reasonable jury to conclude that the Board's stated reasons for firing Helm are pretextual.  Nowhere has Helm demonstrated how the friendly relationship between Abernathy and Barnes influenced any of the disciplinary actions taken by Morris against her.  There is no proof whatsoever that Barnes ever participated in any decision adverse  with respect to Helm, that is, unless every member of the Board is deemed to have been a decisionmaker by virtue of his office.  Nor has Helm shown the presence, or even the suggestion, of gender animus by Barnes, Morris, or the Board towards her.  "To avoid summary judgment [plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993). Helm has made no such showing.  The Board is entitled to summary judgment on Helm's Title VII gender claim.

### ii. The ADEA

The ADEA states that "[i]t shall be unlawful for an employer . . . to limit, segregate, or classify his employees in any way which would deprive or tend to deprive an individual of employment opportunities . . . because of such individual's age."  29 U.S.C. §623(a)(2).  In this case, Helm offers only circumstantial evidence

14

in support of her age claim.  Like Title VII claims, ADEA claims based on circumstantial evidence are evaluated under the *McDonnell Douglas* framework previously discussed.  *Kelliher v. Veneman*, 313 F.3d 1270 (11th Cir. 2002).

To establish a *prima facie* ADEA claim, a plaintiff must show that she was: (1) a member of the protected age group; (2) subjected to an adverse employment action; (3) qualified to do the job; and (4) replaced by or otherwise lost her position to a younger person.  *Chapman* 229 F.3d at 1024.  Alternatively, the plaintiff can satisfy the fourth element by showing that she was treated less favorably than similarly situated and substantially younger employees outside the protected class.  *Maniccia*, 171 F.3d at 1368.  The Board concedes that Helm satisfies each of the first three elements.  It does argue, however, that she cannot not meet the fourth element.

Helm, who was a relatively young forty-seven when she was fired, does not dispute that, after her termination, she was replaced by an older woman, Rebecca Mackey.  In *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-13, 116 S.Ct. 1307, 1310 (1996), the Supreme Court stated (1) "a *prima facie* case requires evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criteria . . . .," and (2) "[i]n the age-discrimination context, such an inference cannot be drawn from the replacement of one

15

worker with another worker insignificantly younger." (internal citations and quotations omitted). From this, it follows that an employee, like Helm, who is replaced by an **older** co-worker cannot establish a *prima facie* case under the classic ADEA approach. The only avenue for her, then, is to prove that she was treated less favorably than an employee or employees who were similarly situated and significantly younger.

Although never directly stated in her brief, Helm impliedly argues that Abernathy, who is thirty-nine years old, is a substantially younger employee who was treated more favorably by the Board than she was. Helm is correct that, for purposes of the ADEA, Abernathy is "substantially younger." *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999) (holding that an employee who was five years younger than the plaintiff was "substantially younger"). Helm might have established a *prima facie* ADEA claim except for her failure, discussed above, to show more favorable treatment of Abernathy, whether based on the age differential or on misconduct. Instead of the obvious, the Board proffers the same legitimate, non-discriminatory reasons in this context as it did in countering Helm's Title VII gender claim. And, just as before, Helm offers no tangible evidence that the Board's justifications are pretextual. The Board is entitled to summary judgment on Helm's ADEA claim.

### iii. Retaliation Under Title VII & The ADEA

16

*a)* Prima Facie *Analysis:*

Both Title VII and the ADEA prohibit an employer from taking retaliatory action against an employee who opposes conduct by her employer proscribed by Title VII or the ADEA.  42 U.S.C. §2000e-3(a).  To establish a *prima facie* case of retaliation under Title VII and the ADEA, plaintiff must show that "(1) she engaged in statutorily protected expression; (2) she suffered an adverse employment actions; and (3) the adverse action was causally related to the protected expression." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002).  The causal connection requirement has been broadly interpreted in the Eleventh Circuit.  *Simmons v. Camden County Bd. of Ed.*, 757 F.2d 1187, 1189 (11th Cir. 1985).  "To establish a causal connection, a plaintiff must show that the decisionmakers were aware of the protected conduct [and] that the protected activity and the adverse employment action were not wholly unrelated." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 584 (11th Cir. 2000).

The Board necessarily concedes that Helm suffered an adverse employment action.  Even so, it contends that Helm cannot establish a *prima facie* case.  The Board's position is based on two contentions: (1) that because Helm brought only an internal complaint of discrimination, she did not engage in statutorily protected expression; and (2) she cannot show a causal connection between her termination and her protected activity (if she engaged

17

in any) because more than a year elapsed between any protected expression and the first adverse employment action.  The Board also contends that even if Helm were able to establish a *prima facie* case, she cannot establish that the Board's proffered non-discriminatory motivations are pretextual.

Helm easily parries the Board's argument that she did not engage in protected expression under the "participation clause" of Title VII.  As Helm rightly notes, there are two distinct types of retaliation claims, those arising under the participation clause and those arising under the opposition clause.  Under the opposition clause, "an employer may not retaliate against an employee because the employee has opposed any practice made an unlawful employment practice by [Title VII]." *E.E.O.C. v. Total Systems Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (quoting 42 U.S.C. §2000e-3(a)).  Under the participation clause, "an employer may not retaliate against an employee because the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *Id.* (quoting 42 U.S.C. §2000e-3(a)).

Helm engaged in activity protected under the opposition clause.  She argues that to recover for retaliation, she "need not prove the underlying claim of discrimination which led to her protest, so long as she had a reasonable good faith belief that the discrimination existed." *Meeks v. Computer Associates*

18

*International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989)).  According to Helm, because she had a reasonable, good-faith belief that the Board was engaging in discriminatory conduct, her letter of September 16, 2003 was statutorily protected expressive activity.  Although the letter hardly constitutes proof of actual gender or age discrimination by the Board, Helm is correct that her letter arguably evinces her good-faith belief that the Board was engaging in proscribed discriminatory conduct.  Thus, for purposes of her retaliation claims, Helm establishes that she engaged in protected conduct.

In evaluating "opposition clause" claims, the court must bear in mind that such claims "are viewed in the context of the ordinary business environment, and . . . are given less protection than participation clause acts."  *Anduze v. Fla. Atl. Univ.*, 151 Fed. Appx. 875, 878 (11th Cir. 2005) (quoting *E.E.O.C. v. Total Systems Services, Inc.*, 221, F.3d 1171, 1176 (11th Cir. 2000)).  Whether to fire an employee for misconduct is, in essence, a business decision.  *Id.*  Business decisions are to be made by employers and not juries, who cannot be allowed to second-guess business decisions as a kind of super-personnel department.  *Damon,* 196 F.3d at 1361.  The jury does not concern itself "with whether an employment decision is prudent or fair, but only with whether it was motivated by unlawful animus."  *Id.*

To establish a *prima facie* case, Helm must establish not only protected conduct but a "causal connection" between her conduct and a subsequent adverse employment action.    Proving a causal connection requires a showing that "the protected activity and the adverse action were not wholly unrelated." *Clover v. Total Systems Services, Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) (internal citations omitted). Generally, "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).  Helm argues that "there [was] a continuous barrage of actions taken after the plaintiff filed her internal claim of discrimination with the defendant."  Pl.'s Br. at 20.  This alleged barrage consisted of four separate incidents: (1) the denial of Helm's claim for back-pay; (2) her return to her duties as a CSR; (3) her March 2004 employee evaluation being lower than the evaluation a year earlier; and (4) the written reprimands she received on three occasions when she clocked in late.  She fails to prove that Morris, or any other decisionmaker was aware of her letter.

Helm's "continuous barrage" argument may support either of two propositions: first, she may be claiming that the four incidents are themselves adverse employment actions undertaken in retaliation for her opposition to discrimination; or second, that the incidents

are simply evidence of a causal link between her letter and the ultimate adverse employment action of termination.  It is not entirely clear which argument, if either, she relies on in claiming a causal connection.  However, this court is persuaded that, with the evidence presented, Helm can, if barely, establish a *prima facie* case of causal connection, although it is almost impossible to believe that the Board was so Machiavellian as to have laid in wait for two years after it received Helm's critical letter until she made the mistake of borrowing $70.00 from the bank bag.

The Board, of course, argues that Helm has not presented any evidentiary basis for a causal connection and to the contrary, that there can be no such connection because the first adverse employment action taken against her occurred a full year after she filed her written grievance.  "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be very close."  *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 1511 (2001) (internal quotations omitted).  In *Breeden*, the Supreme Court cited with approval cases in which a period as short as three months was too attenuated to support a showing of causation.  *See, e.g.*, *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 2001) (holding a 3 month period insufficient); *Gaddis v. Russell Corp.*,

242 F. Supp. 2d 1123, 1146 (M.D. Ala. 2003).  However, in none of these cases was there evidence of a series of actions taken against the employee, some of which, as individual instances, may rise to the level of an actionable adverse employment action, and some of which clearly do not.  Given the factual nature of this inquiry, it is arguable that some of the actions cited by Helm may have been related to her protected conduct.  Although woefully weak, the causal relationship, as things now stand, is a matter for jury determination, that is, if the other essential elements of a retaliation claim are shown, which they are not.

   *b) Pretext Analysis:*

   If a plaintiff makes out a *prima facie* case of retaliation, as the court assumes, *arguendo*, the burden shifts to the defendant to produce legitimate reasons for its conduct.  *Shannon v. BellSouth Telecommunications Inc.*, 292 F.3d 712, 715 (11th Cir. 2002).  In this context, as before, the Board claims that Helm was suspended and ultimately terminated because she violated the attendance policies and misappropriated funds.  These proffered justifications have already been accepted by the court as legitimate and non-discriminatory.  Therefore, the burden returns to Helm to establish that they are pretextual.  In order to do so, she must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 2106

22

(2000).

The Board argues that Helm has offered no evidence to refute its proffered justifications.  In this, as before, the Board is correct.  Addressing the first and best justification, her misappropriation, Helm argues that because the Board did not have an established procedure for the handling of cash receipts, her termination for mishandling cash receipts is pretextual.  As she states, "the sudden importance of what [she] did with $70.00 for a few days is most interesting and clearly pretextual.  It can be argued that it just simply was not that important to [d]efendant to have its cash and check receipts regularly accounted for and deposited."  Pl.'s Br. at 24.  Helm seems to be under the mistaken impression that she need only give a plausible reason why the Board would use her mistake to cover up its real or underlying reason. In this, she is mistaken.  She must offer or point to some affirmative evidence that logically indicates pretextuality.  Her oft-repeated argument that "[i]t is most reasonable and plausible to suggest that, had Helm not been given the bad news that she was suspended . . . she would not have inadvertently left work without [placing a check in the bag]" is simply not responsive.  It may, in fact, be "plausible," but it is also not proof of pretext by the Board.

Helm next points to differences in the Board's articulation of the reason for her termination.  In one of the outstanding motions,

the Board argues that the "evidence" for this argument is inadmissible hearsay and should be excluded.  This court need not reach the question of admissibility, because even if there were evidence that passes muster under the Federal Rules of Evidence, it would be of no help to Helm at the summary judgment stage.  Helm argues that the Board's originally articulated reason for her termination was "misconduct," whereas, later, the Board justified its actions by accusing Helm of "misappropriating" funds.  If Helm were able to show that the original charge was markedly different from the proffered non-discriminatory justification, she might establish a basis for pretext.  However, "misappropriation" must be viewed as a subset of "misconduct."   Helm's quibbles over vocabulary are of no significance.  Admissible or not, Helm's hearsay leads nowhere.

Finally, Helm attempts to establish pretext by making the conclusory assertion, as if she were making a closing argument, that "the most powerful person at [the Board], Lee Barnes, wanted her gone."  Pl.'s Br. at 22.  However, she offers no basis for making this bare assertion other than the fact that she gave testimony during the criminal proceeding against Barnes.  From this piece of wishful thinking, Helm would argue that there is a factual dispute as to what role was played by members of the Board, including Barnes, in making employment decisions.  This, according to Helm, is evidence of pretext.  Although perhaps correct that

there is a dispute about what roles are played by members of the Board, Helm cannot ask this court to join her in concluding that the existence of such a dispute is evidence of pretext by the Board.

In raising Barnes's supposed personal animus towards her, Helm would shift the focus from the Board's proffered justifications and cloud the pretext analysis. "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004). Whatever Barnes's actual role in the termination decision, which is now a matter of pure speculation, Helm has presented no evidence to indicate that his motives, or those of any decisionmaker, were different from those proffered by the Board. For aught appearing, Helm's testimony against Barnes, the ostensible reason for Barnes's animus (not gender and not age), if it occurred, occurred after her termination.

The Board is entitled to summary judgment on Helm's retaliation claims.

### iv. First Amendment Retaliation under §1983

It is well-established that a public employer may not demote or discharge an employee in retaliation for speech protected under the First Amendment. *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989). However, "a public employee's right to

freedom of speech is not absolute." *Id.* (citing *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891 (1987). In First Amendment retaliation cases, a four-step analysis has evolved. First, the court must determine whether the employee's speech may be "fairly characterized as constituting speech on a matter of public concern." *Rankin*, 483 U.S. at 384. Second, if the speech involves a matter of public concern, the trial court must apply the so-called *Pickering* balancing test, weighing the interests of the public employee against the interests of the public employer. *Id.* at 388. Third, if the public employee prevails on the balancing test, the fact-finder must determine whether the employee's speech played a substantial part in the employer's decision. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568 (1977). Finally, if the employee shows that his speech was a substantial motivating factor in the adverse employment decision, the governmental employer in a §1983 case must prove by a preponderance of the evidence that "it would have reached the same decision . . . even in the absence of the protected conduct." *Id.* at 286. In other words, the employer must show that "its legitimate reason, standing alone, would have induced it to make the same decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775 (1989). This fourth inquiry is called the "but for" test or the *Mt. Healthy* defense.

The Board argues that it is entitled to summary judgment on

Helm's First Amendment claims for two reasons: first, that Helm cannot establish the required causal connection between possibly protected speech in the form of her testimony against Barnes and any subsequent adverse employment actions because she did not, in fact, testify at Barnes's criminal trial until after her termination; and second, the Board, invoking the *Mt. Healthy* defense, would have fired her anyway.

The Board inexplicably concedes, *arguendo*, that Helm has established the first two elements of a *prima facie* case. This concession seems motivated by an ill-founded faith in the *Mt. Healthy* defense, which is an affirmative defense. The Board misunderstands the allocation of the burden of proof on *Mt. Healthy*. While *Mt. Healthy* does absolve an employer who proves, by a preponderance of the evidence to a jury, that the employee would have been fired without regard to his offending conduct, it is the **employer** who must prove this fact by a preponderance of the evidence. The Board has not met the Rule 56 burden. Its evidence of a *Mt. Healthy* defense is not, and cannot be, absolute. In fact, the court can find no case in which summary judgment was granted to an employer on a *Mt. Healthy* defense alone. The Board simply offers the same justifications it proffered for its conduct under the *McDonnell Douglas* burden-shifting test and then claims that Helm "does not have substantial evidence that she was disciplined, terminated, or retaliated against, in substantial part, because of

her speech. . . ." Def.'s Br. at 29.  There is no such burden on Helm.  Her burden was elsewhere and she has not met it.

The Board is entitled to summary judgment on the §1983 claim not because of *Mt. Healthy*, on which the Board erroneously relies, but because Helm cannot establish that her grievance letter, or any other expression by her, constituted a matter of public concern. For this reason, she fails to establish a *prima facie* case.  In determining whether an employee's speech touches on a matter of public concern, the court must examine "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48, 106 S.Ct. 1648, 1690-91 (1983).  This inquiry focuses on whether the "main thrust" of the speech in question is essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was.  *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1283-84 (11th Cir. 2006) (internal quotations and citations omitted).

A review of the record in this case clearly indicates that the letter drafted and sent by Helm did not touch on matters of public concern.  A quarreling, complaining letter is not *ipso facto* a matter of public concern.  First, there is no evidence to indicate that the letter and its contents were ever made public in a meaningful way.  Although there is no firm requirement that

protected speech be publically communicated, *Deremo v. Watkins*, 939 F.2d 908, 911 n.3 (11th Cir. 1991), the absence of public participation weighs heavily against Helm.  Second, and more importantly, the letter's primary concern was with the treatment Helm herself had received, and not as if that treatment were a matter in which the general public was interested.  Other than unsubstantiated allegations of incompetence and discrimination, the letter does not raise issues that can fairly be described as of general public interest.  The Board is entitled to summary judgment on Helm's claim of retaliation in response to her letter.

The time lapse between the letter and the termination creates a separate causation hurdle that is difficult, if not impossible, for Helm to overcome.  Nevertheless, the court concedes that what is improbable is still possible.  The Board's claim that Helm has not presented substantial evidence of causation presents a close question.  In a normal situation, determining whether or not a retaliatory motive was the proximate cause of the challenged employment practice is a question of fact for the jury.  *Beckwith v. City of Daytona Beach, Fla.*, 58 F.3d 1554, 1564 (11th Cir. 1995).  "To get before the jury, [plaintiff must] present enough evidence for a reasonable jury to conclude that [her] protected speech was a 'substantial' motivating factor" in the employer's decision.  *Id.*  In this case, the Board argues that the most important item of Helm's conduct allegedly protected by the First

Amendment never actually occurred.  Helm asserts, without concrete evidence, that she testified at Barnes's criminal trial on September 22, 2004.  She describes this as a public expression that provided a motivation for her suspension and for her eventual termination.  However, as the Board notes, there is no evidence that Helm actually testified against Barnes before her termination.  As evidence, Helm points first to the subpoena she received requiring her presence in court on September 22, 2004.  Standing alone, however, the receipt of a subpoena is not evidence of actual testimony in a public trial and cannot form the basis for a First Amendment claim.  Helm also cites to the following passage from her deposition testimony, not given until August 2, 2006:

> * * *
>
> Q.: Do you know if [Barnes] was indicted in Jefferson County?
>
> A.: Yes, sir.
>
> Q.: Do you know when that was?
>
> A.: He's had two indictments from Jefferson County.  I don't remember when the first one was.  It was sometime when all of that was going on.  And then several months back I believe that the judge threw it out on technicalities of the way it was actually presented or worded.  So they went back, the DA's office went back, reworded the indictment and it came back again.
>
> Q.: And it's your understanding that's still pending, or that

he's actually being charged right now and awaiting trial?

A.: He's awaiting trial.

Q.: Are you a witness in that trial?

A.: Yes, sir, I am.

Q.: Have you – do you know the trial date?

A.: I believe it is September 18th, 18th or 19th, whatever
that Monday is, because it's almost been like two or three
years.

\* \* \*

Helm Dep. 234-35; Def.'s Ex. 1.  This passage is hardly a model of
clarity.  However, it appears clear, as the Board points out, that
the quoted passage is a reference to testimony given by Helm in
September **2006,** if at all, long after Helm was terminated and after
this suit was filed.  For this and the other reasons discussed
above, the Board is entitled to summary judgment on Helm's §1983
claims of First Amendment retaliation.

**v. ICC/PA Position**

The Board is also entitled to summary judgment on all claims
relating to Helm's application for an ICC/PA position and any other
allegedly adverse employment actions that predate the 180 day
limitation period for complaining to the EEOC.  Helm's said claims
are barred because she failed to file a charge with the EEOC within
the mandatory 180 day filing period required by both Title VII and
the ADEA.  42 U.S.C. §2000e-5(e)(1); 29 U.S.C. §626(d)(1).

31

## V. Conclusion

For the separate and several reasons stated above, the court agrees with the Board.  Therefore, the court will grant its motion for summary judgment by a separate order.

DONE this 19th day of January, 2007.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE